\* 1 0 3 7 0 8 6 4 4 0 \*

## IN THE DISTRICT COURT OF CLEVELAND COUNTY
## STATE OF OKLAHOMA

|  |  |  |
|---|---|---|
| STATE OF OKLAHOMA, ex rel., | § | |
| MIKE HUNTER, | § | |
| ATTORNEY GENERAL OF OKLAHOMA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| (1) PURDUE PHARMA L.P.; | § | |
| (2) PURDUE PHARMA, INC.; | § | |
| (3) THE PURDUE FREDERICK COMPANY; | § | |
| (4) TEVA PHARMACEUTICALS USA, INC.; | § | |
| (5) CEPHALON, INC.; | § | |
| (6) JOHNSON & JOHNSON; | § | |
| (7) JANSSEN PHARMACEUTICALS, INC.; | § | |
| (8) ORTHO-McNEIL-JANSSEN | § | |
| PHARMACEUTICALS, INC., n/k/a | § | |
| JANSSEN PHARMACEUTICALS, INC.; | § | |
| (9) JANSSEN PHARMACEUTICA, INC., | § | |
| n/k/a JANSSEN PHARMACEUTICALS, INC.; | § | |
| (10) ALLERGAN, PLC, f/k/a ACTAVIS PLC, | § | |
| f/k/a ACTAVIS, INC., f/k/a WATSON | § | |
| PHARMACEUTICALS, INC.; | § | |
| (11) WATSON LABORATORIES, INC.; | § | |
| (12) ACTAVIS LLC; and | § | |
| (13) ACTAVIS PHARMA, INC., | § | |
| f/k/a WATSON PHARMA, INC., | § | |
| | § | |
| Defendants. | § | |

STATE OF OKLAHOMA ⎫ S.S.
CLEVELAND COUNTY ⎰

**FILED**

JUN 3 0 2017

In the office of the
Court Clerk MARILYN WILLIAMS

Case No. CJ-2017-816
JURY TRIAL DEMANDED

## ORIGINAL PETITION

EXHIBIT 5

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................1

II.  JURISDICTION AND VENUE ...............................................................3

III. PARTIES ...............................................................................................3

    A.      Plaintiff ...........................................................................................3

    B.      Defendants .......................................................................................4

            i.       The Purdue Defendants................................................4

            ii.      The Actavis Defendants...............................................4

            iii.     The Cephalon Defendants.............................................5

            iv.     The Janssen Defendants................................................5

IV.  FACTUAL ALLEGATIONS ...................................................................6

    A.      Defendants' Conduct Created A Devastating Opioid Epidemic
           in Oklahoma...................................................................................6

            i.       Defendants' Deceptive and Misleading Prescription Opioid
                   Marketing Campaign Has Caused a Devastating
                   Public Health Crisis in Oklahoma....................................6

            ii.      Defendants' Deceptive and Misleading Marketing Campaign
                   Has Caused an Immense Financial Burden on Oklahoma,
                   Its Businesses, Consumers, Communities and Citizens .................8

    B.      Defendants Falsely and Deceptively Marketed Their Opioids in
           Oklahoma.....................................................................................12

            i.       Defendants Spent Millions of Dollars to Falsely Market Their
                   Opioids.......................................................................13

            ii.      Defendants Falsely Marketed Their Opioids in Oklahoma
                   Through Other Clandestine Channels...........................15

                  1.      Defendants Used Members of the Medical Community
                          to Falsely Market Their Opioids.......................................16

2.  Defendants Funded Seemingly Third-Party Groups to Spread Their False Marketing Even Further and Give Their Statements False Credibility......................................17

C.  Defendants' Representations Were False and Misleading........................19

D.  Defendants Concealed the Truth About their Campaign...........................20

V.  CAUSES OF ACTION .......................................................................20

A.  Oklahoma Medicaid False Claims Act, 63 Okl. St. §§ 5053.1-7...............20

    i.   Count 1..........................................................................21

    ii.  Count 2..........................................................................22

B.  Oklahoma Medicaid Program Integrity Act, 56 Okl. St. §§ 1001-1008....23

C.  Oklahoma Consumer Protection Action, 15 Okl. St. §§ 751-65 ...............24

    i.   Count 1..........................................................................25

    ii.  Count 2..........................................................................26

D.  Public Nuisance, 50 Okl. St. § 2 .................................................27

E.  Fraud (Actual and Constructive) and Deceit ...........................................28

F.  Unjust Enrichment ....................................................................30

VI. JURY DEMAND ...............................................................................31

VII. PRAYER.......................................................................................31

"The most depraved criminals are often the dispensers of these habit-forming drugs."
--Editorial Comment, *American Medicine,* 1915[1]

## I.   **INTRODUCTION**

1.      Opioids are highly addictive, habit-forming drugs.  They always have been.  That is why, for centuries, medical professionals employed opium-based drugs with caution and only prescribed them in limited circumstances to patients with cancer, terminal illnesses, or acute short-term pain.

2.      Defendants manufacture and sell opioids and, therefore, the limited uses for which doctors prescribed them were undermining Defendants' bottom line.  Defendants wanted to increase their opioid sales.  And increase them they did.  For example, from 1996 to 2000, OxyContin sales rose from $48 million to more than $1 billion.  By 2009, OxyContin retail sales reached $3 billion.

3.      One way to sell more opioids was to expand the market beyond a niche for cancer patients, the terminally ill, and acute short-term pain and persuade medical professionals to prescribe more opioids to a broader range of patients with chronic non-cancer related pain.   To convince medical professionals to prescribe more opioids to a broader range of patients, Defendants elected to falsely downplay the risk of opioid addiction and overstate the efficacy of opioids for more wide-ranging conditions, including chronic non-cancer pain.

4.      Over a period of several years, Defendants executed massive and unprecedented marketing campaigns through which they misrepresented the risks of addiction from their opioids and touted unsubstantiated benefits.  To encourage physicians to prescribe more opioids, Defendants event went so far as to tell prescribers that classic signs of addiction should actually

---

[1] 21 (O.S.), 10 (N.D.) (November 1915): 799-800 (discussing spread of narcotic drug addiction).

be treated with **more** opioid use because they were signs of "pseudoaddiction" which meant the patient was supposedly experiencing undertreated pain.

5.     The damage Defendants' false and deceptive marketing campaigns caused to the State of Oklahoma is catastrophic.   Oklahoma is one of the leading states in prescription painkiller sales per capita, with 128 painkiller prescriptions dispensed per 100 people in 2012. Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009.  According to 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed per adult resident, with approximately 877 milligrams of opioids distributed per adult resident.

6.     A 2016 government study estimated the national economic impact of prescription opioid overdoses, abuse and dependence to be $78.5 billion annually, with one-fourth of the amount funded by public sources including government funded insurance and government expenditures on treatment of substance abuse.  As a result of Defendants' egregious conduct, the State of Oklahoma paid, and continues to pay, millions of dollars for health care costs that stem from prescription opioid dependency.   These costs include unnecessary and excessive opioid prescriptions, substance abuse treatment services, ambulatory services, inpatient hospital services and emergency department services, among others.  Defendants' conduct also caused the State of Oklahoma to incur substantial social and economic costs including criminal justice costs, and lost work productivity costs, among others.

7.     Plaintiff, the State of Oklahoma, by and through its Attorney General (hereinafter "Oklahoma" or "the State"), seeks to recover for the damages caused by Defendants' wrongdoing and impose all applicable penalties under Oklahoma law.  As such, the State, upon

personal knowledge as to its own acts and beliefs, and upon information and belief as to all other matters, alleges as follows:

## II.  JURISDICTION AND VENUE

8.     The State is asserting the claims set forth in Section V below, one of which is the Oklahoma Medicaid False Claims Act ("OMFCA"), Okla. Stat. tit. 63, §§5053.1-7.   Under §5053.7 of the OMFCA, "[t]he district courts shall have jurisdiction over any action brought under the laws of the state for the recovery of funds paid by a state or local government if the action arises from the same transaction or occurrence as an action brought under the [OMFCA]."

9.     Further, this Court has jurisdiction over Defendants because Defendants conduct business in Cleveland County and throughout Oklahoma, and have deliberately engaged in significant acts and omissions within Oklahoma that have injured the State and its citizens. Defendants purposefully directed their activities at Oklahoma and its citizens, and the claims arise out of those activities.

10.     Venue is proper in this Court under §5053.7 because at least one of the Defendants transacts business and committed acts proscribed by the OMFCA in this judicial district.

11.     Venue is also proper in this Court under Okla. Stat. tit. 12, §137.

## III.  PARTIES

A.   **Plaintiff**

12.     The State of Oklahoma is a sovereign state of the United States.   This action is brought for and on behalf of the sovereign State, by and through Mike Hunter, the Attorney General and chief law officer for the State and all its departments and agencies.

**B.     Defendants**

      i.    The Purdue Defendants

13.    Defendant Purdue Pharma L.P. is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Connecticut. Defendant Purdue Pharma Inc. is a New York corporation with its principal place of business in Connecticut. Defendant Purdue Frederick Company is a Delaware corporation with its principal place of business in Connecticut. At all relevant times, Purdue Pharma L.P., Purdue Pharma Inc., and the Purdue Frederick Company (collectively "Purdue") acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

14.    Defendant Purdue manufactures several opioids, including OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER and promotes, markets, and sells its opioids in the State of Oklahoma.

      ii.    The Actavis Defendants

15.    Defendant Allergan Plc is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis Plc acquired Allergan Plc in March 2015, and the combined company changed its name to Allergan Plc in March 2015. Before that, Defendant Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then Actavis Plc in October 2013. Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan Plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc). Defendant Actavis Pharma, Inc. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc. Defendant Actavis LLC is a Delaware limited

liability company with its principal place of business in Parsippany, New Jersey. At all relevant times, Allergan Plc, Actavis Plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. (collectively, "Actavis") acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

16.     Defendant Actavis manufactures several branded opioids, including Kadian and Norco, and several generic opioids, and promotes, markets, and sells its opioids in the State of Oklahoma.

iii.     The Cephalon Defendants

17.     Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Pennsylvania. Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in Pennsylvania, and acquired Cephalon in October 2011. Defendants Cephalon and Teva USA are collectively referred to herein as "Cephalon." After Teva USA acquired Cephalon in October 2011, Teva USA and Cephalon acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

18.     Defendant Cephalon manufactures several opioids, including Actiq and Fentora and promotes, markets, and sells its opioids in the State of Oklahoma.

iv.     The Janssen Defendants

19.     Defendant Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in New Jersey, and is a wholly owned subsidiary of Defendant Johnson & Johnson (J&J), a New Jersey corporation with its principal place of business in New Jersey. Defendant Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen

Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in New Jersey. Defendant Janssen Pharmaceutica Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in New Jersey. At all relevant times, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Ortho-McNeil-Janssen Pharmaceuticals, Inc, Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica Inc. (collectively, "Janssen") acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

20.     Defendant Janssen manufactures, or manufactured in the past, several opioids, including Duragesic, Nucynta, and Nucynta ER and promotes, markets, and sells its opioids in the State of Oklahoma.

## IV.    FACTUAL ALLEGATIONS

### A.    Defendants' Conduct Created A Devastating Opioid Epidemic in Oklahoma

#### i.    Defendants' Deceptive and Misleading Prescription Opioid Marketing Campaign Has Caused a Devastating Public Health Crisis in Oklahoma

21.     Defendants make billions of dollars in profits through their deceptive and misleading opioid marketing campaign. The U.S. opioid market generates at least $10 billion a year in profits to opioid manufacturers like Defendants. For example, Purdue's sales of OxyContin alone have generated estimated sales of more than $35 billion since its release in 1996. While Defendants' unprecedented prescription opioid disinformation campaign yields drug manufacturers like Defendants billions of dollars in annual profits, Oklahoma is left bearing the enormous costs of the resulting public health crisis wreaking havoc in its communities.

22.     According to the Center for Disease Control and Prevention (the "CDC"), an increase in the availability and accessibility of opioids has contributed to the prescription drug abuse epidemic in the nation. As sales of prescription opioids have quadrupled since 1999, so

have overdose deaths involving prescription opioids. From 1999 to 2015, more than 183,000 people died in the U.S. from overdoses related to prescription opioids. In 2014, almost 2 million Americans abused or were dependent on prescription opioids. According to the CDC, as many as 1 in 4 people prescribed opioids long term for non-cancer pain in primary care settings struggles with opioid addiction.

23.     Oklahoma has been hit particularly hard by Defendants' deceptive marketing of opioids. Oklahoma is one of the leading states in prescription painkiller sales per capita, with 128 painkiller prescriptions dispensed per 100 people in 2012. Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009. In 2012, Oklahoma had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of these deaths.

24.     In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate.

25.     In 2015, 823 fatal drug overdoses occurred in Oklahoma, an almost 140% increase over 2001, with opioids contributing to the largest number of these deaths. As of 2015, there were more prescription drug overdose deaths each year in Oklahoma than overdose deaths from alcohol and all illegal drugs combined.

26.     According to 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed per adult resident with approximately 877 milligrams of opioids distributed per adult resident.

27.     A National Survey on Drug Use and Health revealed Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers.

28.     The accessibility and availability of prescription opioids also is fueling illicit opioid addiction.  According to the CDC, past misuse of prescription opioids is the strongest risk factor for a person starting and using heroin.  Between 2000 and 2014, the number of overdose deaths from heroin nationwide quintupled.

29.     As the State passes stricter legislation to combat opioid over-prescription, Oklahomans addicted to prescription opioids are turning to illicit opioids such as heroin as a cheaper and more accessible alternative.  From 2007 to 2012, the number of heroin deaths in Oklahoma increased tenfold.

30.     Defendants' conduct is affecting even Oklahoma's youngest and most vulnerable citizens.  Oklahoma hospitals are reporting an increasing number of newborns testing positive for drugs or alcohol at birth.  The national rate of babies born with neonatal abstinence syndrome ("NAS"), a group of conditions newborns experience when withdrawing from exposure to drugs like opioids, increased fivefold from 2000 to 2012.  In 2014, the number of newborns testing positive for prescription medications doubled the number reported in 2013.  Babies born with NAS require lengthy hospital stays and other medical treatment and thus, dramatically increase health care costs for the State of Oklahoma and its citizens.

      ii.    <u>Defendants' Deceptive and Misleading Marketing Campaign Has Caused an Immense Financial Burden on Oklahoma, Its Businesses, Consumers, Communities and Citizens</u>

31.     Defendants' deceptive marketing campaign and the resulting opioid abuse and addiction epidemic caused, and continues to cause, the State of Oklahoma, its businesses, communities and citizens to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others.

32.     As Oklahomans aged 35-54 have the highest death rate of any age group for

prescription opioid-related overdoses, Defendants' conduct caused Oklahoma businesses, communities, workers and families to incur the substantial costs and losses of poor work performance, injuries, absenteeism, unemployment and lack of economic productivity.

33.     The Governor's and Attorney General's Task Force on Mental Health, Substance Abuse and Domestic Violence's report on the economic impact of substance abuse on the State of Oklahoma revealed substance abuse related issues cost the State billions of dollars annually.

34.     Defendants' deceptive and misleading marketing campaign caused Oklahoma to pay millions of dollars for unnecessary or excessive opioid prescriptions.

35.     From 2007 to present, the Purdue Defendants caused to be submitted over 95,000 prescriptions for reimbursement to the Oklahoma Health Care Authority, on behalf of the Oklahoma Medicaid system, for the Purdue Defendants' opioids.  The Oklahoma Health Care Authority has paid approximately $49,965,906.05 for these drugs.  Exhibit 1.

36.     From 2009 to present, the Actavis Defendants caused to be submitted, over 1,300 prescriptions for reimbursement to the Oklahoma Health Care Authority, on behalf of the Oklahoma Medicaid system, for the Actavis Defendants' opioids.  The Oklahoma Health Care Authority has paid approximately $1,097,382.32 for these drugs.  Exhibit 2.

37.     From 2007 to present, the Cephalon Defendants have caused to be submitted approximately 245 prescriptions for reimbursement to the Oklahoma Health Care Authority, on behalf of the Oklahoma Medicaid system, for the Cephalon Defendants' opioids.  The Oklahoma Health Care Authority has paid approximately $647,410.96 for these drugs.  Exhibit 3.

38.     From 2007 to present, the Janssen Defendants have caused to be submitted over 2,600 prescriptions for reimbursement to the Oklahoma Health Care Authority, on behalf of the Oklahoma Medicaid system, for the Janssen Defendants' opioids.  The Oklahoma Health Care

Authority has paid approximately $1,209,446.77 for these drugs.  Exhibit 4.

39.     The above amounts include only amounts the Oklahoma Medicaid program paid for Defendants' branded opioids prescriptions.  They do not include amounts the Oklahoma Medicaid program paid for any generic opioids prescriptions that were manufactured, promoted, marketed and sold in Oklahoma by any Defendants.

40.     Defendants' conduct caused Oklahoma private insurers, businesses and consumers to pay millions of dollars for unnecessary or excessive opioid prescriptions.

41.     Defendants' decades long false and deceptive marketing campaign caused Oklahoma and its consumers to bear other substantial health care costs related to prescription opioid abuse and addiction.

42.     Defendants' conduct caused the State of Oklahoma to incur substantial costs and losses for prescription opioid dependency related health care costs including substance abuse treatment services, ambulatory services, inpatient hospital services and emergency department services, among others.

43.     Defendants' conduct caused Oklahoma businesses and consumers to incur substantial costs and losses for prescription opioid dependency related health care costs including substance abuse treatment services, ambulatory services, inpatient hospital services, and emergency department services, among others.

44.     Oklahomans that abuse or misuse opioids are more likely to utilize medical services, such as emergency departments, physician outpatient visits, and inpatient hospital stays.  According to the CDC, every day, over 1,000 people are treated in emergency departments for misusing prescription opioids.  In 2014 alone, the government recorded 1.27 million emergency

room visits or hospital inpatient stays for opioid-related issues, a 64 percent increase for inpatient care and a 99 percent jump for emergency room treatment compared from 2005.

45.     The public health crisis caused by Defendants' deceptive marketing campaign also is overwhelming Oklahoma's criminal justice system.  The opioid epidemic costs Oklahoma millions of dollars a year on criminal justice related costs.  Oklahoma spends 50 percent of its annual criminal justice system budget on substance abuse related costs.  And a 2016 CDC study reported the prescription opioid epidemic caused $7.7 billion in criminal justice related costs borne directly by states and local government.

46.     Defendants' deceptive marketing campaign also caused Oklahoma to expend substantial resources on education and prevention programs to combat an escalating opioid abuse epidemic.  The State's public education efforts include a statewide comprehensive media campaign to reduce prescription drug abuse in Oklahoma, the development and delivery of comprehensive presentations on prescription drug abuse, and funding to high-needs counties to implement community-based prescription drug abuse prevention, among other programs.

47.     The State of Oklahoma worked to provide information to the public on appropriate disposal and storage of prescription opioids. The State also initiated programs and expended significant resources to educate prescribers and dispensers of prescription opioids including working to develop an online pain management curriculum and creating and distributing opioid prescribing and dispensing guidelines.  The State also worked to educate providers on the Oklahoma Prescription Monitoring Program (PMP) which requires dispensers of Schedule II, III, IV and V controlled substances to submit prescription dispensing information to the Oklahoma Bureau of Narcotics and Dangerous Drugs Control within 24 hours of dispensing a scheduled narcotic and allows prescribers to check the prescription history of their

patients.  The State also developed and distributed education materials and educated providers and dispensers on proper storage and disposal of prescription opioids.

48.     Oklahoma also spent significant resources and funds to enhance its PMP and coordinate the sharing of data among state agencies.  In 2015, the Oklahoma Legislature passed a bill requiring prescribers to check the PMP the first time they prescribe opiate painkillers and two other classes of drugs and to check every 180 days thereafter.  The State also is working to establish hospital emergency department discharge databases, and implement public health surveillance of neonatal abstinence syndrome.

49.     The State of Oklahoma would not have needed to spend substantial public resources and funding on opioid use and abuse education, prevention and intervention programs but for Defendants' false and deceptive prescription opioid marketing campaign.

50.     Despite Oklahoma's efforts to combat the opioid abuse and addiction crisis caused by Defendants' conduct, opioid dependency remains an escalating public health crisis.

**B.      Defendants Falsely and Deceptively Marketed Their Opioids in Oklahoma**

51.     Defendants caused catastrophic damage to the State of Oklahoma by dramatically altering the perception of opioids by doctors and patients alike.  Prior to Defendants' deceptive marketing campaign, the medical community and consumers primarily relied on opioids for limited purposes, such as surgery recovery, cancer treatment, and end-of-life palliative care. This was largely due to the risk of addiction and abuse posed by these powerful drugs. Defendants sought to change that perception in two key ways.  First, Defendants misrepresented the risks of addiction and abuse from opioids.  Defendants falsely represented that the risks of addiction were overstated and that scientific studies supported a low risk of addiction associated with their drugs.   Second, Defendants touted unsubstantiated benefits of opioid treatment,

including its effectiveness in treating chronic non-cancer related pain. Defendants repeated these misrepresentations to physicians and consumers throughout the country, including directly to physicians and consumers in Oklahoma. At times, Defendants specifically targeted vulnerable patient populations. Each Defendant employed massive and unprecedented marketing campaigns premised on these two key misrepresentations.

     i.   <u>Defendants Spent Millions of Dollars to Falsely Market Their Opioids</u>

52. Defendants utilized several mediums to distribute the false representations regarding their opioids. Defendants targeted this deceptive marketing to both prescribers and consumers of opioids to change their perceptions of these drugs and develop brand loyalty.

53. Through their marketing campaign, Defendants falsely represented and/or omitted the risks of addiction and falsely touted the benefits of their opioids. For example:

- Defendant Purdue distributed a series of advertisements known as "pain vignettes" which included purported case studies of patients with chronic pain conditions and recommended OxyContin for each. One vignette, for example, described a "54-year old writer with osteoarthritis of the hands" and implied that OxyContin would help him work more effectively.

- Defendant Purdue distributed a promotional video stating, among other things: "There's no question that our best, strongest pain medicines are the opioids...In fact, the rate of addiction amongst pain patients who are treated by doctors is much less than 1%. They don't wear out, they go on working. They do not have serious medical side effects...These drugs which I repeat are our best, strongest pain medications should be used much more than they are for patients in pain."

- According to an interview by a former Purdue sales manager from 2003, Defendant Purdue trained its sales representatives for OxyContin "to say things like it is 'virtually' non-addicting...That's what we were instructed to do. It's not right, but that's what they told us to say." This same manager claimed he was trained that OxyContin was "non-habit forming."

- Defendant Purdue misrepresented OxyContin in medical journal advertisements as, among other things, having been studied for all kinds of arthritis, promoting for use with the elderly without provide accompanying risk information, and omitting information about abuse and addiction potential.

- Defendant Purdue represented OxyContin was less addictive and safer than other brands of oxycodone.

- Defendant Actavis distributed written product advertisements that minimized and/or omitted the serious risks associated with Kadian and also misrepresented its benefits by making unsupported representations, such as it would, among other things, "Allow patients to live with less pain and get adequate rest with less medication" and implying it would relieve stress caused by pain and help patients enjoy their lives.

- Defendant Actavis's predecessor caused a patient education brochure to be distributed in 2007 for Kadian that claimed addiction is "less likely if you have never had an addiction problem."

- Defendant Actavis trained its sales representatives with documents claiming that "most chronic benign pain patients do have markedly improved ability to function when maintained on chronic opioid therapy"; long-acting opioids were less likely to produce addiction than short-acting opioids; and certain behaviors, generally associated with addiction, actually constituted "pseudoaddiction."

- Defendant Janssen made unsubstantiated representations that Nucynta was appropriate for broader pain conditions than indicated and downplayed its risks.

- Defendant Cephalon, through its sales force and other marketing, misrepresented Actiq and Fentora as being appropriate for non-cancer pain and non-opioid-tolerant individuals, despite their labels' contrary warnings.

54. Defendants employed large forces of sales representatives who spoke directly to doctors and repeated their misrepresentations, falsely representing the risk of addiction was low and touting unsubstantiated benefits of long term opioid treatment, including that such long-term treatment would improve function in patients. Defendants conducted these aggressive marketing campaigns directly to Oklahoma physicians and consumers.

55. The scale of Defendants' marketing campaigns was massive. For example, Defendant Purdue, from 1996-2001, hosted dozens of national pain-management and speaker-training conferences for physicians, pharmacists, and nurses to be trained as part of Purdue's national speaker bureau. These speakers then promoted Defendant Purdue's opioids and further spread its misrepresentations. During this same time frame, Purdue more than doubled its

number of sales representatives from 318 to 671. Defendant Purdue utilized a bonus system for its sales representatives designed to encourage maximum OxyContin prescriptions. In 2001 alone, Defendant Purdue reportedly paid $40 million in sales bonuses. Defendant Purdue targeted much of its marketing at primary care physicians, rather than pain specialists. Further, Defendant Purdue also relied on several types of branded items to promote its products including hats, toys, coffee mugs, and even a pen that had a conversion chart attached to it allowing a physician to calculate dosages to convert a patient from other opioid pain relievers to OxyContin. In other words, Defendant Purdue treated the marketing of a Schedule II controlled substance as if it were peddling paper products.

56.     Overall, Defendants grossly misrepresented to Oklahoma physicians and consumers the risk of addiction, including falsely stating that the risk of addiction was less than 1%. Defendants made such misrepresentations by touting supposed "studies" like the "Porter & Jick Study"—which Defendants grossly misrepresented as being a comprehensive study. In fact, this "Study" comprised a 101-word paragraph in a medical journal from 1980, which focused exclusively on hospitalized patients who were given narcotics in a hospital setting. It did not establish or support the misrepresentation for which Defendants used it (*i.e.* that addiction is rare from opioid treatment of pain). Defendants also misrepresented that the risk of addiction from opioids is particularly low if prescribed by a doctor and/or if the patient has no prior addiction history.

57.     Defendants spent millions of dollars on these direct marketing campaigns to ensure the success of their deceptive messaging.

> ii. <u>Defendants Falsely Marketed Their Opioids in Oklahoma Through Other Clandestine Channels</u>

58.     Direct marketing under their own brand was not the end of Defendants' scheme.

Defendants could not work this scheme without providing some "scientific" support for their statements. Defendants did this by operating through "Key Opinion Leaders" or "KOLs" and third-party groups to further spread their misrepresentations about opioids.

1. *Defendants Used Members of the Medical Community to Falsely Market Their Opioids*

59.     KOLs are doctors who act as consultants or advisors to Defendants and through whom Defendants tout their misrepresentations regarding the risk of addiction and benefits of opioids. Defendants paid KOLs to give speeches, talks, and speak at continuing medical education seminars (CMEs) about opioids, advocating that they could be used effectively to treat things like chronic pain and downplaying the risks of addiction and abuse. By operating through KOLs, Defendants added perceived legitimacy and/or impartiality to their misrepresentations regarding opioids.

60.     Defendants operated through many of the same KOLs including Dr. Russell Portenoy and Dr. Lynn Webster.

61.     Dr. Portenoy is the former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York. Multiple Defendants utilized Dr. Portenoy as a KOL, providing him with funding and consultant fees, to help spread their misrepresentations regarding their opioids and opioid use in general. Dr. Portenoy spread these same misrepresentations through speeches, CMEs, and media appearances, including one of Defendants' favorite misrepresentations that less than 1% of opioid users become addicted. For example, in 2010 Dr. Portenoy appeared on *Good Morning America* and is quoted as stating that "[a]ddiction, when treating pain, is distinctly uncommon." Dr. Portenoy has since acknowledged that at least certain of his statements and misrepresentations were false and unsupported.

62.     Dr. Webster is the former Chief Medical Director of Lifetree Clinical Research, a pain clinic in Utah.  Like Dr. Portenoy, multiple Defendants utilized Dr. Webster as a KOL, providing him with funding and consultant fees in exchange for spreading their misrepresentations regarding opioids and opioid use in general through CMEs and speeches.  Dr. Webster also spoke about the concept of "pseudoaddiction" which Defendants used to convince prescribers that classic signs of addiction should actually be treated with ***more*** opioid use because they were signs of "pseudoaddiction" which meant the patient was supposedly experiencing undertreated pain.  Like Dr. Portenoy, Dr. Webster has since acknowledged several of the misrepresentations he previously made regarding opioids and opioid use.

> 2. *Defendants Funded Seemingly Third-Party Groups to Spread Their False Marketing Even Further and Give Their Statements False Credibility*

63.     In addition to KOLs, Defendants relied on seemingly unaffiliated and impartial organizations to promote opioid use.  Defendants utilized and funded these organizations to spread their misrepresentations by downplaying the risks of addiction of opioids and the benefits of use for conditions like chronic pain.  Defendants funded, directed, and controlled several such organizations, and certain of Defendants' KOLs also served in various roles for these organizations, including as board members and officers.

64.     For example, the American Pain Foundation (the "APF") was one of the more prominent "pain advocacy" organizations Defendants utilized to spread their misrepresentations. While APF purported to be an independent organization, it obtained much of its funding from pharmaceutical companies such as Defendants.  In 2010, the APF reportedly obtained almost 90% of its $5 million funding from drug and medical device companies including certain Defendants such as Purdue.  Defendants, through the APF, created treatment guides and other materials for patients and others that downplayed the addiction risks of opioids and exaggerated

17

their benefits. Defendants, through the APF, also specifically promoted opioid use among veterans. APF made these materials available nationwide, including in Oklahoma. These guides were funded by Defendants to spread their misrepresentations further and add perceived legitimacy and impartiality. For example, one guide described the supposedly low risk of addiction from opioids, claimed signs of requiring larger doses were not indications of addiction but signs that larger doses were needed, and that most of the side effects of opioids go away quickly. As another example, in 2007, Defendants Purdue and Cephalon sponsored an APF treatment guide that omitted and understated the risks of addiction from long-term opioid treatment. While the APF held itself out as an independent and impartial organization, it was controlled and influenced by Defendants. The APF eventually shut its doors in 2012 after details of its relationship with the pharmaceutical industry, including certain Defendants, came to light.

65.     Another supposedly unaffiliated and impartial group Defendants utilized was the American Academy of Pain Medicine ("AAPM"). The AAPM claimed addiction risk of opioid treatment was low when used to treat people in pain. For example, in 2009, the AAPM in conjunction with another pain advocacy group issued treatment guidelines promoting the use of opioids for chronic non-cancer pain. These guidelines were authored and issued under the AAPM name but were funded by Defendants and several of Defendants' KOLs participated in drafting the guidelines themselves.

66.     The list of groups Defendants funded and utilized to spread their misrepresentations is long. Indeed, Defendants have been tied to at least the following groups that distributed pro-opioid messages for Defendants with the same misrepresentations regarding the risk of addiction and benefits: the American Pain Society; American Geriatrics Society, American Chronic Pain Association, American Society of Pain Education, National Pain

Foundation, and Pain & Policy Studies Group. Defendants used groups like those listed above to spread their misrepresentations about the risk of addiction of opioids and their benefits.

**C.   Defendants' Representations Were False and Misleading**

67.   Through the misrepresentations and omissions described above, Defendants convinced doctors and consumers that, despite the instructions on their drug labels and the longstanding practice of prescribing opioids only in limited circumstances, there is a low risk of addiction with long-term opioid use.   Additionally, Defendants convinced doctors and consumers, through their misrepresentations and omissions, that opioids are effective treatment for chronic non-cancer pain and signs of addiction could actually be signs of "pseudoaddiction" requiring heavier doses of opioids.   Defendants convinced Oklahoma doctors and consumers of these same misrepresentations.

68.   Defendants' representations were false, deceptive, and unsupported.   Numerous studies demonstrate the addiction and abuse risk posed by opioids, including when used to treat chronic pain.   Even some of Defendants' own KOLs have admitted several of their representations regarding opioid use, risks, and benefits were false and unsupported, including Drs. Portenoy and Webster.   For example, Dr. Webster, once a wide proponent of the concept of "pseudoaddiction" for Defendants, has since stated "It obviously became too much of an excuse to give patients more medication...It led us down a path that caused harm.   It is already something we are debunking as a concept."

69.   In fact, according to the 2016 *CDC Guideline for Prescribing Opioids for Chronic Pain*, "[e]xtensive evidence shows the possible harms of opioids," including "opioid use disorder" and "overdose."   Also, "the clinical evidence review...did find that continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."   Further, "[n]o

evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later." Moreover, "[e]xtensive evidence suggests some benefits of nonpharmacologic and nonopioid pharmacologic treatments compared with long-term opioid therapy, with less harm."

70.    Defendants knew their misrepresentations were false and unsupported. Among other things, Defendants' marketing efforts often contradicted their own labels, which acknowledged the risk of abuse and addiction.

71.    The nationwide opioid epidemic gripping this country and ravaging the State of Oklahoma also confirms Defendants' representations about the low risk of addiction and abuse their drugs posed were false. Thousands of Oklahomans have lost their lives to this epidemic and many more Oklahomans' lives, families and communities are destroyed by opioid addiction.

**D.    Defendants Concealed the Truth About their Campaign**

72.    The nature of Defendants' marketing scheme required Defendants to conceal the truth for it to be effective. Thus, Defendants operated from behind the scenes, spreading their deceptive misrepresentations through KOLs and third-party groups to conceal their own involvement. Defendants also concealed the falsity of their misrepresentations regarding addiction risk and the benefits of long-term opioid treatment. As such, while the opioid epidemic spread, Defendants' role and responsibility remained concealed. The State could not have acquired such knowledge through the exercise of reasonable diligence.

## V.    CAUSES OF ACTION

**A.    Oklahoma Medicaid False Claims Act, 63 Okl. St. §§ 5053.1-7**

73.    The allegations set forth above are incorporated by reference herein.

74.     The State brings these claims on behalf of itself against Defendants under Section 5053.1 of the Oklahoma Medicaid False Claims Act.

    i.  Count 1

75.     Each Defendant knowingly caused to be presented false or fraudulent claims for payment by Oklahoma Medicaid by marketing their drugs in a manner aimed at downplaying the risks of opioids (specifically the risks of addiction and abuse), overstating their efficacy, and, thus, wrongly increasing the number of prescriptions made to Oklahoma Medicaid patients.

76.     Each Defendant knew that healthcare providers to whom it marketed its drugs had treated and would continue to treat Oklahoma Medicaid patients.

77.     Each Defendant knew it was downplaying the addiction and abuse risks of opioids.

78.     Each Defendant knew it was overstating the efficacy of opioids.

79.     Each Defendant knew these misrepresentations were material and false, or made these misrepresentations with deliberate ignorance of the truth or falsity of the information or in reckless disregard of the truth or falsity of the information.

80.     Each Defendant knew its false statements were material to healthcare providers' decision to prescribe opioids to Oklahoma Medicaid patients.  Indeed, Defendants intended such statements to be material to encourage additional opioid prescriptions.

81.     Each Defendant knew its marketing scheme would cause claims to be submitted for payment by Oklahoma Medicaid, which claims would not have been submitted but for Defendants' false marketing.

82.     Because of the false or fraudulent claims Defendants knowingly caused to be presented, the State sustained substantial actual damages.

ii.   <u>Count 2</u>

83.   Each Defendant knowingly made or used, or caused to be made or used, false statements material to a false or fraudulent claim submitted for payment by Oklahoma Medicaid because Defendants (and their agents) made and used false statements regarding the risks, efficacy, and medical necessity of opioids in marketing their drugs to healthcare providers who treat and prescribe medicines to Oklahoma Medicaid patients.

84.   Each Defendant knew that healthcare providers to whom they marketed their drugs had treated and would continue to treat Oklahoma Medicaid patients.

85.   Each Defendant knew it was downplaying the addiction and abuse risks of opioids.

86.   Each Defendant knew it was overstating the efficacy of opioids.

87.   Each Defendant knew these misrepresentations were material and false, or made these misrepresentations with deliberate ignorance of the truth or falsity of the information or in reckless disregard of the truth or falsity of the information.

88.   Each Defendant knew its false statements were material to healthcare providers' decision to prescribe opioids to Oklahoma Medicaid patients.  Indeed, Defendants intended such statements to be material to encourage additional opioid prescriptions.

89.   But for Defendants' false statements, the false claims at issue would not have been submitted for payment by Oklahoma Medicaid.

90.   Because of the false or fraudulent claims Defendants knowingly caused to be presented, the State sustained substantial actual damages.

91.   Under the Oklahoma Medicaid False Claims Act, the State seeks all actual damages and penalties as permitted under the Oklahoma Medicaid False Claims Act; and all

22

other appropriate relief to which the State is entitled under the Oklahoma Medicaid False Claims Act, including costs of bringing this action.

**B.     Oklahoma Medicaid Program Integrity Act, 56 Okl. St. §§ 1001-1008**

92.     The allegations set forth above are incorporated by reference herein.

93.     The State of Oklahoma brings these claims on behalf of itself against Defendants under Sections 1001-1008 of the Oklahoma Medicaid Program Integrity Act.

94.     Each Defendant willfully and knowingly caused to be made, by commission or omission, false claims for payment to Oklahoma Medicaid by marketing its drugs in a manner that minimized or misrepresented their risks of addiction and abuse, overstated their efficacy, and, thereby, wrongly increased the number of prescriptions made to Oklahoma Medicaid patients.

95.     Each Defendant knew that healthcare providers to whom it marketed its drugs had treated and would continue to treat Oklahoma Medicaid patients.

96.     Each Defendant knew it was minimizing and misrepresenting the addiction and abuse risks of opioids and overstating the efficacy of opioids.

97.     Each Defendant knew its false statements would encourage healthcare providers to prescribe opioids to Oklahoma Medicaid patients.   Indeed, each Defendant intended such statements to encourage additional opioid prescriptions.

98.     Each Defendant knew its deceptive marketing scheme would cause false claims to be submitted for payment to Oklahoma Medicaid and would cause the Oklahoma Medicaid program to approve and pay false claims.

99.     The false claims would not have been submitted and would not have been paid by the Oklahoma Medicaid program but for Defendants' improper false marketing.

100. Because the Oklahoma Medicaid program approved and paid false claims submitted because of Defendants' improper conduct, the State of Oklahoma sustained substantial actual damages and Defendants are liable to the State.

101. Under the Oklahoma Medicaid Program Integrity Act, the State seeks full restitution of all funds or payments Defendants' received in violation of the Oklahoma Medicaid Program Integrity Act, all penalties as permitted under the Oklahoma Medicaid Program Integrity Act; and all other appropriate relief to which the State is entitled under the Oklahoma Medicaid Program Integrity Act, including costs of bringing this action, litigation, and attorney's fees.

**C. Oklahoma Consumer Protection Action, 15 Okl. St. §§ 751-65**

102. The allegations set forth above are incorporated by reference herein.

103. The State, on behalf of itself and the residents of the State of Oklahoma, brings these claims against Defendants under Sections 756.1 and 761.1 of the Oklahoma Consumer Protection Act.

104. In carrying out their marketing campaigns described herein—including through advertising and sales calls—each Defendant violated the Oklahoma Consumer Protection Act.

105. Defendants engaged in "deceptive trade practices" as defined by the Oklahoma Consumer Protection Act because, as described herein, Defendants made misrepresentations and omissions in marketing their opioids that deceived or could reasonably be expected to deceive or mislead consumers.

106. Further, Defendants engaged in "unfair trade practices" as defined by the Oklahoma Consumer Protection Act because, as explained herein, Defendants' intentional practices of marketing their respective opioids so as to downplay their risks, overstate their

efficacy, and misrepresent their medical necessity, including for off-label uses, constitute practices which offend established public policy and which are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

i. Count 1

107.    Defendants knowingly made false or misleading representations as to the characteristics, ingredients, uses, and benefits of their respective opioids by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of their opioids.

108.    Specifically, Defendants engaged in the following conduct:

- Defendants knowingly misrepresented the state of the science and material facts regarding the addictiveness of their respective opioids;

- Defendants knowingly omitted material information related to the addictiveness of their respective opioids;

- Defendants knowingly misrepresented the efficacy of their respective opioids by marketing their opioids as improving function for patients for which there was no evidence to support these claims; and

- Defendants knowingly misrepresented the benefits and efficacy of their respective opioids by vastly overstating their ability to safely and effectively treat or manage pain on a long-term and/or short-term basis and omitting or downplaying the severe risk of addiction.

109.    Defendants' misrepresentations caused actual damages to the State and residents of the State.

ii.    Count 2

110.    Defendants knowingly made false or misleading representations as to the source, sponsorship, approval, or certification of their respective opioids by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of their opioids and propping up these false and misleading representations with additional false statements regarding certain academic reports and studies related to opioids.

111.    Defendants also knowingly made false representations as to the sponsorship, approval, status, affiliation or connection of certain persons in the medical and academic communities with respect to their opioids.

112.    Specifically, Defendants engaged in the following conduct:

- Defendants misrepresented and/or omitted the results and conclusions of academic reports and studies related to the addictiveness, effectiveness, and medical necessity of their opioids;

- Defendants made false representations and/or omissions as to the sponsorship, approval, and/or certification by the medical professionals who performed or authored these academic reports and studies, which Defendants misused in their marketing efforts; and

- Defendants made false representations and/or omissions as to the sponsorship, approval, and/or certification by the journals that published these academic reports and studies, which Defendants misused in their marketing efforts.

113.    Defendants misleadingly used these academic reports and studies to induce consumers, to prescribe, order, and/or purchase Defendants' opioids.

114.    Defendants' misrepresentations caused actual damages to the State and residents

of the State.

115.    Under the Oklahoma Consumer Protection Act, the State seeks: a declaratory judgment that Defendants' acts or practices violate the Oklahoma Consumer Protection Act; an injunction against Defendants from violating the Oklahoma Consumer Protection Act; actual damages and penalties as provided under the Oklahoma Consumer Protection Act; reasonable expenses and investigation fees, including attorney's fees; and all other appropriate relief to which the State is entitled under the Oklahoma Consumer Protection Act.

**D.    Public Nuisance, 50 Okl. St. § 2**

116.    The allegations set forth above are incorporated by reference herein.

117.    The State, on behalf of itself, brings this claim against Defendants to abate the public nuisance they created.

118.    Defendants' misrepresentations and omissions regarding opioids, as set forth above, have created an opioid epidemic in Oklahoma that constitutes a public nuisance. Defendants have created a condition that affects entire communities, neighborhoods, and considerable numbers of persons.

119.    Defendants' misrepresentations and omissions regarding opioids constitute unlawful acts and/or omissions of duties, that annoy, injure, or endanger the comfort, repose, health, and/or safety of others.  The annoyance, injury and danger to the comfort, repose, health, and safety of Oklahoma citizens includes, but is not limited to:

- Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009;

- In 2012, Oklahoma had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of those deaths;

27

- In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate;

- Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers;

- Prescription opioid addiction often leads to illicit opioid use and addiction;

- According to the CDC, past misuse of prescription opioids is the strongest risk factor for heroin initiation and use;

- From 2007 to 2012, the number of heroin deaths in Oklahoma increased tenfold;

- Oklahoma hospitals are reporting an increasing number of newborns testing positive for prescription medications; and

- Defendants' deceptive marketing campaign and the resulting opioid abuse and addiction epidemic caused the State of Oklahoma, its businesses, communities and citizens to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others.

120.   The State seeks to abate the public nuisance Defendants created and all necessary relief to abate such public nuisance.

**E.     Fraud (Actual and Constructive) and Deceit**

121.   The allegations set forth above are incorporated by reference herein.

122.   Defendants made false representations to healthcare providers working for the State, and/or omitted material facts, regarding the risks, efficacy, and medical necessity of their opioids, which assertions Defendants knew were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions.  Namely, Defendants knowingly and/or recklessly:

- downplayed the substantial risks of addiction and other side-effects of their opioids, including affirmatively stating in sales calls and other marketing outlets that their drugs were not as addictive as they truly are, stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring more opioid treatment, and omitting the high risk of addiction actually present;

- overstated the efficacy of their opioids, including making false statements regarding the effectiveness of the drugs for treating chronic non-cancer pain and their ability to improve function; and

- misrepresented the medical usefulness and necessity of their opioids, including affirmatively marketing their drugs for off label uses without solicitation and not in response to questions from healthcare providers.

123. Defendants' misrepresentations and omissions had a tendency to deceive others, to violate public confidence, and/or injure public interests. Defendants, having chosen to speak and make representations to healthcare providers working for the State regarding their opioids, were under a duty to disclose the whole truth, and not disclose partial and misleading truths.

124. Defendants intended healthcare providers working for the State to rely upon Defendants' false assertions regarding the risks, efficacy, and medical necessity of their opioids, to increase the number of opioid prescriptions made by healthcare providers. Indeed, Defendants made such false representations and omissions, at times, contrary to what their own drug labels stated.

125. Healthcare providers working for the State did in fact rely on Defendants' false representations, as seen by the increasing number of opioid prescription claims that have been submitted to and paid by Oklahoma Medicaid.

29

126.    Oklahoma Medicaid would not have incurred the costs associated with paying for unnecessary opioid prescription claims *but for* Defendants' false representations and omissions regarding the risks, efficacy, and medical necessity of Defendants' opioids.

127.    These unnecessary payments made by Oklahoma Medicaid constitute damages suffered by the State.

128.    The State seeks to recover all damages caused by Defendants' fraudulent representations and omissions.

129.    Defendants acted with knowledge and willful intent, with reckless disregard for the rights of others, and/or intentionally and with malice towards others.  As such, the State seeks to recover punitive damages against Defendants.

**F.      Unjust Enrichment**

130.    Due to Defendants' conduct as described herein, Defendants were unjustly enriched at the expense of the State.

131.    For years, Defendants have peddled their opioids on the basis of false claims regarding the drugs' addictiveness and effectiveness and, in doing so, have siphoned millions of dollars from the State's coffers into their corporate bank accounts.  While many Oklahomans' lives are ravaged by opioid abuse and addiction, Defendants have lined their pockets with State monies paid for opioid prescriptions that, but for Defendants' deceptive marketing scheme described herein, would never have been prescribed.

132.    The State is entitled to recover Defendants' ill-gotten gains.

133.    The Court should impose a constructive trust under the doctrine of unjust enrichment.

## VI.    JURY DEMAND

134.    Plaintiff requests a trial by jury on all issues so triable.

## VII.    PRAYER

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Declaration that Defendants have violated the Oklahoma Medicaid False Claims Act;

B.    All actual damages and penalties as permitted under the Oklahoma Medicaid False Claims Act, including actual damages resulting from costs of opioid prescriptions paid by the State, addiction treatment costs, increased health care costs, criminal justice costs, and lost work productivity expenses, among others;

C.    Declaration that Defendants have violated the Oklahoma Medicaid Program Integrity Act;

D.    Full restitution for all funds or payments Defendants received in violation of the Oklahoma Medicaid Program Integrity Act.

E.    All penalties as permitted under the Oklahoma Medicaid Program Integrity Act;

F.     All other appropriate relief to which the State is entitled under the Oklahoma Medicaid Program Integrity Act, including costs of bringing this action, litigation, and attorney's fees.

G.    Declaration that Defendants' acts or practices violated the Oklahoma Consumer Protection Act;

H.    An injunction against Defendants from violating the Oklahoma Consumer Protection Act;

I.    Actual damages and penalties as provided under the Oklahoma Consumer Protection Act;

J.    Reasonable expenses and investigation fees, including attorney's fees;

K.    Abatement of the public nuisance Defendants have created and all costs necessary to abate such nuisance;

L.    All actual damages caused by Defendants' fraud;

M.    Punitive damages;

N.    Disgorgement of Defendants' ill-gotten gains; and

O.    All other relief to which the State is entitled.

Dated:  June 30, 2017

*Mike Hunter*

Mike Hunter, OBA No. 4503
ATTORNEY GENERAL FOR
  THE STATE OF OKLAHOMA
Abby Dillsaver, OBA No. 20675
GENERAL COUNSEL TO
  THE ATTORNEY GENERAL
Ethan A. Shaner, OBA No. 30916
DEPUTY GENERAL COUNSEL
313 N.E. 21st Street
Oklahoma City, OK 73105
Telephone:    (405) 521-3921
Facsimile:    (405) 521-6246
Emails:        abby.dillsaver@oag.ok.gov
                ethan.shaner@oag.ok.gov

Michael Burrage, OBA No. 1350
Reggie Whitten, OBA No. 9576
WHITTEN BURRAGE
512 N. Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Telephone:    (405) 516-7800
Facsimile:    (405) 516-7859
Emails:        mburrage@whittenburragelaw.com
                rwhitten@whittenburragelaw.com

Bradley E. Beckworth, OBA No. 19982
Jeffrey J. Angelovich, OBA No. 19981
NIX, PATTERSON & ROACH, LLP
512 N. Broadway Avenue, Suite 200
Oklahoma City, OK 73102
Telephone:    (405) 516-7800
Facsimile:    (405) 516-7859
Emails:        bbeckworth@nixlaw.com
                jangelovich@npraustin.com

Glenn Coffee, OBA No. 14563
GLENN COFFEE & ASSOCIATES, PLLC
915 N. Robinson Ave.
Oklahoma City, OK 73102
Telephone:    (405) 601-1616
Email:         gcoffee@glenncoffee.com
**ATTORNEYS FOR PLAINTIFF**

1

# EXHIBIT 1

Dispensed between 1/1/2007-*6/21/2017

| Drug | Corporation Name | Claims | Units | Paid | Year Dispensed |
|---|---|---|---|---|---|
| DILAUDID | PURDUE PHARMA L.P. | 1 | 20.00 | $6.98 | 2008 |
| DILAUDID | PURDUE PHARMA L.P. | 88 | 9,689.00 | $9,539.65 | 2009 |
| DILAUDID | PURDUE PHARMA L.P. | 38 | 4,139.00 | $4,150.73 | 2010 |
| DILAUDID | PURDUE PHARMA L.P. | 29 | 3,890.00 | $5,213.38 | 2011 |
| DILAUDID | PURDUE PHARMA L.P. | 38 | 6,423.00 | $9,198.54 | 2012 |
| DILAUDID | PURDUE PHARMA L.P. | 18 | 2,790.00 | $5,374.94 | 2013 |
| DILAUDID | PURDUE PHARMA L.P. | 9 | 2,160.00 | $3,909.64 | 2014 |
| DILAUDID | PURDUE PHARMA L.P. | 10 | 1,200.00 | $5,375.76 | 2015 |
| DILAUDID | PURDUE PHARMA L.P. | 21 | 2,169.00 | $11,298.40 | 2016 |
| DILAUDID | PURDUE PHARMA L.P. | 5 | 452.00 | $2,790.07 | *2017 |
| | Total | 257 | 32,932.00 | $56,858.09 | |
| DILAUDID-HP | PURDUE PHARMA L.P. | 2 | 1,750.00 | $6,885.46 | 2010 |
| | Total | 2 | 1,750.00 | $6,885.46 | |
| HYSINGLA ER | PURDUE PHARMA L.P. | 997 | 29,414.00 | $356,877.76 | 2015 |
| HYSINGLA ER | PURDUE PHARMA L.P. | 2,356 | 69,647.00 | $966,022.94 | 2016 |
| HYSINGLA ER | PURDUE PHARMA L.P. | 1,231 | 36,337.00 | $533,789.25 | *2017 |
| | Total | 4,584 | 135,398.00 | $1,856,689.95 | |
| MS CONTIN | PURDUE PHARMA L.P. | 32 | 6,270.00 | $36,419.46 | 2007 |
| MS CONTIN | PURDUE PHARMA L.P. | 12 | 2,850.00 | $18,743.15 | 2008 |
| MS CONTIN | PURDUE PHARMA L.P. | 14 | 3,789.00 | $17,877.09 | 2009 |
| MS CONTIN | PURDUE PHARMA L.P. | 11 | 3,920.00 | $19,189.55 | 2010 |
| MS CONTIN | PURDUE PHARMA L.P. | 8 | 2,880.00 | $15,742.91 | 2011 |
| MS CONTIN | PURDUE PHARMA L.P. | 12 | 4,320.00 | $27,391.18 | 2012 |
| MS CONTIN | PURDUE PHARMA L.P. | 13 | 4,380.00 | $32,055.79 | 2013 |
| MS CONTIN | PURDUE PHARMA L.P. | 11 | 3,960.00 | $34,693.35 | 2014 |
| MS CONTIN | PURDUE PHARMA L.P. | 11 | 3,960.00 | $41,005.82 | 2015 |
| MS CONTIN | PURDUE PHARMA L.P. | 12 | 4,320.00 | $51,794.68 | 2016 |
| MS CONTIN | PURDUE PHARMA L.P. | 6 | 2,160.00 | $26,001.21 | *2017 |
| | Total | 142 | 42,809.00 | $320,914.19 | |
| OXYCONTIN | PURDUE PHARMA L.P. | 2,318 | 158,805.00 | $1,120,199.33 | 2007 |
| OXYCONTIN | PURDUE PHARMA L.P. | 10,477 | 705,740.00 | $4,596,342.80 | 2008 |
| OXYCONTIN | PURDUE PHARMA L.P. | 10,765 | 706,359.00 | $5,177,861.24 | 2009 |
| OXYCONTIN | PURDUE PHARMA L.P. | 9,802 | 640,201.00 | $5,006,801.66 | 2010 |
| OXYCONTIN | PURDUE PHARMA L.P. | 9,105 | 601,224.00 | $5,141,554.59 | 2011 |
| OXYCONTIN | PURDUE PHARMA L.P. | 7,693 | 509,720.00 | $4,597,836.96 | 2012 |
| OXYCONTIN | PURDUE PHARMA L.P. | 7,064 | 465,271.00 | $4,375,287.75 | 2013 |
| OXYCONTIN | PURDUE PHARMA L.P. | 6,581 | 431,599.00 | $4,227,237.38 | 2014 |
| OXYCONTIN | PURDUE PHARMA L.P. | 9,415 | 568,839.00 | $4,925,986.10 | 2015 |
| OXYCONTIN | PURDUE PHARMA L.P. | 11,459 | 671,199.00 | $5,714,468.93 | 2016 |
| OXYCONTIN | PURDUE PHARMA L.P. | 5,835 | 339,569.00 | $2,840,981.62 | *2017 |
| | Total | 90,514 | 5,798,526.00 | $47,724,558.36 | |
| | Grand Total | 95,499 | 6,011,415.00 | $49,965,906.05 | |

2

# EXHIBIT 2

Dispensed between 1/1/2007-*6/21/2017

| Drug | Corporation Name | Claims | Units | Paid | Year Dispensed |
|---|---|---|---|---|---|
| KADIAN | ALLERGAN | 38 | 2,252.00 | $21,405.15 | 2009 |
| KADIAN | ALLERGAN | 575 | 36,020.00 | $346,964.49 | 2010 |
| KADIAN | ALLERGAN | 548 | 36,966.00 | $435,243.93 | 2011 |
| KADIAN | ALLERGAN | 87 | 6,645.00 | $151,659.78 | 2012 |
| KADIAN | ALLERGAN | 42 | 2,321.00 | $65,492.22 | 2013 |
| KADIAN | ALLERGAN | 39 | 2,206.00 | $76,616.75 | 2014 |
| | Total | 1,329 | 86,410.00 | $1,097,382.32 | |

3

# EXHIBIT 3

Dispensed between 1/1/2007-*6/21/2017

| Drug | Corporation Name | Claims | Units | Paid | Year Dispensed |
|------|------------------|--------|-------|------|----------------|
| ACTIQ | TEVA PHARMACEUTICALS USA, INC | 43 | 3,284.00 | $140,867.05 | 2007 |
| ACTIQ | TEVA PHARMACEUTICALS USA, INC | 1 | 90.00 | $8,219.15 | 2008 |
| | Total | 44 | 3,374.00 | $149,086.20 | |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 37 | 2,502.00 | $53,680.69 | 2007 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 34 | 2,326.00 | $67,275.06 | 2008 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 18 | 1,208.00 | $27,816.65 | 2009 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 16 | 1,189.00 | $37,192.09 | 2010 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 20 | 1,548.00 | $56,303.06 | 2011 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 18 | 1,524.00 | $58,336.26 | 2012 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 16 | 1,064.00 | $56,888.71 | 2013 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 30 | 2,100.00 | $114,187.82 | 2014 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 11 | 616.00 | $26,500.44 | 2015 |
| FENTORA | TEVA PHARMACEUTICALS USA, INC | 1 | 28.00 | $143.98 | 2016 |
| | Total | 201 | 14,105.00 | $498,324.76 | |
| | Grand Total | 245 | 17,479.00 | $647,410.96 | |

4

# EXHIBIT 4

Dispensed between 1/1/2007-*6/21/2017

| Drug | Corporation Name | Claims | Units | Paid | Year Dispensed |
|------|------------------|--------|-------|------|----------------|
| DURAGESIC | JOHNSON AND JOHNSON | 69 | 676.00 | $15,968.37 | 2007 |
| DURAGESIC | JOHNSON AND JOHNSON | 14 | 225.00 | $10,576.58 | 2008 |
| DURAGESIC | JOHNSON AND JOHNSON | 49 | 510.00 | $24,707.78 | 2009 |
| DURAGESIC | JOHNSON AND JOHNSON | 102 | 1,175.00 | $59,897.43 | 2010 |
| DURAGESIC | JOHNSON AND JOHNSON | 90 | 970.00 | $58,471.95 | 2011 |
| DURAGESIC | JOHNSON AND JOHNSON | 88 | 970.00 | $62,026.38 | 2012 |
| DURAGESIC | JOHNSON AND JOHNSON | 65 | 790.00 | $66,059.83 | 2013 |
| DURAGESIC | JOHNSON AND JOHNSON | 45 | 550.00 | $52,983.08 | 2014 |
| DURAGESIC | JOHNSON AND JOHNSON | 30 | 300.00 | $34,665.48 | 2015 |
| DURAGESIC | JOHNSON AND JOHNSON | 29 | 290.00 | $32,474.21 | 2016 |
| DURAGESIC | JOHNSON AND JOHNSON | 6 | 55.00 | $3,818.15 | *2017 |
| | Total | 587 | 6,511.00 | $421,649.24 | |
| NUCYNTA | JOHNSON AND JOHNSON | 50 | 4,206.00 | $9,302.61 | 2009 |
| NUCYNTA | JOHNSON AND JOHNSON | 128 | 10,800.00 | $26,809.76 | 2010 |
| NUCYNTA | JOHNSON AND JOHNSON | 264 | 20,962.00 | $58,164.90 | 2011 |
| NUCYNTA | JOHNSON AND JOHNSON | 298 | 24,771.00 | $73,199.01 | 2012 |
| NUCYNTA | JOHNSON AND JOHNSON | 190 | 18,942.00 | $62,966.90 | 2013 |
| NUCYNTA | JOHNSON AND JOHNSON | 188 | 16,658.00 | $62,041.85 | 2014 |
| NUCYNTA | JOHNSON AND JOHNSON | 147 | 11,815.00 | $56,978.22 | 2015 |
| NUCYNTA | JOHNSON AND JOHNSON | 132 | 10,739.00 | $64,369.17 | 2016 |
| NUCYNTA | JOHNSON AND JOHNSON | 68 | 5,925.00 | $33,969.29 | *2017 |
| | Total | 1,465 | 124,818.00 | $447,801.71 | |
| NUCYNTA ER | JOHNSON AND JOHNSON | 13 | 690.00 | $3,553.99 | 2011 |
| NUCYNTA ER | JOHNSON AND JOHNSON | 73 | 4,157.00 | $24,382.72 | 2012 |
| NUCYNTA ER | JOHNSON AND JOHNSON | 75 | 4,335.00 | $29,836.63 | 2013 |
| NUCYNTA ER | JOHNSON AND JOHNSON | 93 | 5,514.00 | $38,349.16 | 2014 |
| NUCYNTA ER | JOHNSON AND JOHNSON | 139 | 8,172.00 | $90,105.80 | 2015 |
| NUCYNTA ER | JOHNSON AND JOHNSON | 113 | 6,519.00 | $96,200.34 | 2016 |
| NUCYNTA ER | JOHNSON AND JOHNSON | 80 | 4,580.00 | $57,567.18 | *2017 |
| | Total | 586 | 33,967.00 | $339,995.82 | |
| | Grand Total | 2,638 | 165,296.00 | $1,209,446.77 | |